**No. 23-3279; 23-3282**

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

——————

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**JAIME CENTENO,**

Defendant-Appellant.

——————

Appeal from the
United States District Court
for the Southern District of California
Honorable Marilyn Huff Presiding

——————

**APPELLANT'S OPENING BRIEF**

——————

Cindy V. Muro
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Cindy_Muro@fd.org
Attorneys for Mr. Centeno

TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................ 1

JURISDICTION AND BAIL STATUS ..................................... 3

I.  Basis for Jurisdiction in the District Court ................... 3

II.  Basis for Appellate Jurisdiction ................................ 3

III.  Bail Status ............................................................. 4

ISSUES PRESENTED FOR REVIEW ...................................... 4

I.  Whether the district court's failure to conduct the third step
    of *Batson* requires remand. ..................................... 4

II.  Whether the district court erred in excluding any mention of
     the medication Olanzapine. ...................................... 4

CONSTITUTIONAL AND STATUTORY PROVISIONS ................ 4

STATEMENT OF THE CASE ................................................ 5

I.  The court denied Mr. Centeno's *Batson* objections without
    reaching the third step. ............................................. 6

II.  The district court prohibited Mr. Centeno from introducing
     evidence relating to his history with a specific medication ......... 10

SUMMARY OF ARGUMENT .............................................. 13

ARGUMENT ................................................................... 14

I.  The district court's failure to conduct step three of the
    *Batson* analysis after hearing the prosecutor's reasons for
    striking four female jurors requires remand. ................. 14

    A.  The standard of review is *de novo*. ....................... 16

    B.  The court only addressed the first two steps of *Batson*
        and did not conduct a step three analysis. .............. 16

i

C.   This Court should remand for the district court to conduct *Batson's* third step.....................................................19

D.   Alternatively, *de novo* review demonstrates that the prosecutor's explanations for striking Jurors 25 and 15 were pretext for purposeful gender discrimination.............21

    1.   The prosecutor's explanation for striking Juror 25 was a pretext for purposeful discrimination. ..............21

    2.   The prosecutor's explanation for striking Juror 15 was a pretext for purposeful discrimination. ..............25

II.   The district court erred in excluding any mention of the medication Olanzapine..................................................................27

A.   Standard of review is *de novo*.................................................27

B.   The name of the medication Olanzapine was admissible under the rules of evidence. ................................27

    1.   Reference to Olanzapine is highly relevant.................28

    2.   The reference to Olanzapine was not unduly prejudicial.......................................................................30

    3.   Because Olanzapine was not offered to prove the truth of the matter asserted, it was admissible as nonhearsay evidence.....................................................33

C.   Even if the district court properly excluded the mention of Olanzapine under the rules of evidence, it was nevertheless admissible under Mr. Centeno's constitutional right to present a defense. .............................37

D.   The government cannot prove that the district court's error was harmless..................................................................40

CONCLUSION ........................................................................................41

CERTIFICATE OF COMPLIANCE ................................................................42

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Batson v. Kentucky,*
476 U.S. 79 (1986) ............................................................... 1, 13, 15, 24

*California v. Trombetta,*
467 U.S. 479 (1984) ...................................................................... 37

*Crane v. Kentucky,*
476 U.S. 683 (1986) ...................................................................... 37

*Flowers v. Mississippi,*
588 U. S. 284 (2019) ................................................................. 14, 21

*Green v. LaMarque,*
532 F.3d 1028 (9th Cir. 2008) .................................................... 17, 24

*Harris v. Harberlin,*
526 F.3d 903 (6th Cir. 2008) ........................................................ 20

*J. E. B. v. Alabama ex rel. T. B.,*
511 U. S. 127 (1994) .................................................................... 15

*Johnson v. California,*
545 U.S. 162 (2005) .................................................................... 16

*Johnson v. Vasquez,*
3 F.3d 1327 (9th Cir. 1993) .......................................................... 26

*Kesser v. Cambra,*
465 F.3d 351 (9th Cir. 2006) .......................................... 13, 15, 24, 25

*Lewis v. Lewis,*
321 F.3d 824 (9th Cir. 2003) ........................................................ 26

iii

*Miller-El v. Cockrell,*
537 U.S. 322 (2003) ................................................................ 21

*Miller-El v. Dretke,*
545 U.S. 231 (2005) ........................................................... 22, 23

*Old Chief v. United States,*
519 U.S. 172 (1997) ................................................................ 31

*Orr v. Bank of Am., NT & SA,*
285 F.3d 764 (9th Cir. 2002) ................................................. 36

*Paulino v. Castro,*
371 F.3d 1083 (9th Cir. 2004) ............................................... 16

*Purkett v. Elem,*
514 U.S. 765 (1995) ........................................................... 13, 15

*Rice v. Collins,*
546 U.S. 333 (2006) ............................................................. 2, 15

*Shirley v. Yates,*
807 F.3d 1090 (9th Cir. 2015) ............................................... 15

*Snyder v. Louisiana,*
552 U.S. 472 (2008) ........................................................... 13, 15

*United States v. Alanis,*
335 F.3d 965 (9th Cir. 2003) .......................................... *passim*

*United States v. Alvarez-Ulloa,*
784 F.3d 558 (9th Cir. 2015) ......................................... 16, 18, 19

*United States v. Anderson,*
741 F.3d 938 (9th Cir. 2013) ............................................... 31

*United States v. Boulder*,
　384 F.3d 794 (9th Cir. 2004) .................................................. 37, 38, 39

*United States v. Chavez*,
　229 F.3d 946 (10th Cir. 2000) ............................................................ 35

*United States v. Collins*,
　551 F.3d 914 (9th Cir. 2009) .............................................................. 23

*United States v. Edwards*,
　235 F.3d 1173 (9th Cir. 2000) ............................................................ 40

*United States v. Emmert*,
　829 F.2d 805 (9th Cir. 1987) .............................................................. 27

*United States v. Gaitan-Acevedo*,
　148 F.3d 577 (6th Cir. 1998) .............................................................. 35

*United States v. Hernandez-Garcia*,
　44 F.4th 1157 (9th Cir. 2022) ............................................................ 16

*United States v. Kirk*,
　844 F.2d 660 (9th Cir. 1988) .............................................................. 34

*United States v. Leal-Del Carmen*,
　697 F.3d 964 (9th Cir. 2012) .............................................................. 40

*United States v. Lieberman*,
　637 F.2d 95 (2d Cir. 1980) ................................................................. 35

*United States v. Mende*,
　43 F.3d 1298 (9th Cir. 1995) .............................................................. 32

*United States v. Nishida*,
　2021 WL 3140331 (9th Cir. July 26, 2021) ........................................ 19

*United States v. Patterson,*
   819 F.2d 1495 (9th Cir. 1987)................................................ 32

*United States v. Stever,*
   603 F.3d 747 (9th Cir. 2010)................................................ 27

*United States v. Vallejo,*
   237 F.3d 1008 (9th Cir. 2001).............................................. 33

*United States v. Vallejo,*
   246 F.3d 1150 (9th Cir. 2001).............................................. 33

*United States v. Whitman,*
   771 F.2d 1348 (9th Cir. 1985).............................................. 37

*United States v. You,*
   382 F.3d 958 (9th Cir. 2004)............................................... 16

## STATUTES

8 U.S.C. § 1326 ..................................................................... 1, 3
8 U.S.C. § 1326(a) ........................................................... *passim*
18 U.S.C. § 3742(a) .................................................................. 3
28 U.S.C. § 3231 ....................................................................... 3
28 U.S.C. § 1291 ....................................................................... 3
28 U.S.C. § 1294(1) ................................................................... 3

## RULES

Fed. R. App. P. 4(b)................................................................. 4
Fed. R. Evid. 401..................................................................... 28
Fed. R. Evid. 402..................................................................... 28
Fed. R. Evid. 403..................................................................... 31
Fed. R. Evid. 801(c)................................................................. 33

## INTRODUCTION

Jaime Centeno went to the San Ysidro Port of Entry on the U.S./Mexican border near San Diego with just a ripped copy of his California identification card, several copies of his Mexican birth certificate, and various documents relating to his time in prison and immigration custody. He was not trying to sneak into the country undetected. Instead, he wanted to get arrested so he would get Olanzapine, a medication he had received while in custody in the past. Mr. Centeno's plan somewhat worked—he was arrested and charged with attempted entry after deportation under 8 U.S.C. § 1326.

The Sixth Amendment of the Constitution guaranteed Mr. Centeno a fair trial on those charges. But from the very of the start of the trial, that guarantee became no more than wishful thinking.

During jury selection, the prosecution used four of their six preemptory challenges to strike female jurors. But when Mr. Centeno raised a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), the trial court ruled on just the first two of *Batson's* three steps. Specifically, after the government offered its reasons for striking each female juror, the court responded only: "The Court believes that's a fair explanation," or that it was "a fair explanation and a nondiscriminatory reason." 2-ER-215–16.

Having a "fair explanation," or even a "nondiscriminatory reason," only answers *Batson's* second step—whether the prosecution offered a

gender-neutral explanation. By merely saying the reasons were "fair" or "nondiscriminatory," the court never reached the third step, which involves a "searching" evaluation of "the persuasiveness" of the government's justification. *Rice v. Collins*, 546 U.S. 333, 337–38 (2006).

Because the district court failed to conduct *Batson's* third step, this Court should remand for it to do so. But should this Court instead choose to conduct its own analysis *de novo*, the record supports a finding of pretext and discriminatory intent for striking at least two of the female jurors. For instance, the government's reasons applied equally to similarly situated men who were not struck. Some reasons were not supported by the record. And other reasons were unrelated to Mr. Centeno's case.

The court also gutted Mr. Centeno's defense at trial by excluding key evidence. His defense hinged on one element of the offense—that he did not have the specific intent to enter free from official restraint to mix freely with the general population. Instead, he wanted to be arrested so that he could obtain the medication Olanzapine.

Mr. Centeno's defense was much more plausible because of key pieces of evidence he carried with him. That evidence included medical records from his past time in custody, an address book, and medical records from his current arrest. The common thread in these items— and the reason they were integral to his defense—is that all three referenced the same drug, Olanzapine.

2

Specifically, the medical records from his past time in custody showed that he received Olanzapine during prior periods of incarceration. The address book had an annotation for that same medication. Finally, when he was arrested in the instant case, records from the facility he was detained at showed that he again received Olanzapine while in custody. With each piece of evidence, Mr. Centeno intended to show that he wanted to be arrested to receive this same drug, but the court did not allow any mention of it. By excluding this evidence, the court denied Mr. Centeno a "meaningful opportunity" to present his defense.

Because the court failed to conduct the third *Batson* step, and because the district court denied Mr. Centeno a meaningful opportunity to present a defense, this Court should vacate Mr. Centeno's conviction and remand for a new trial.

JURISDICTION AND BAIL STATUS

## I. Basis for Jurisdiction in the District Court

Mr. Centeno appeals his conviction for one count of attempted reentry under 8 U.S.C. § 1326. The district court had original subject matter jurisdiction under 28 U.S.C. § 3231.

## II. Basis for Appellate Jurisdiction

This Court has jurisdiction over a timely appeal from a final order entered in the Southern District of California. 28 U.S.C. §§ 1291 & 1294(1); 18 U.S.C. § 3742(a). The district court sentenced Mr. Centeno

3

on October 30, 2023, and entered a final judgment the same day. 1-ER-2. Mr. Centeno filed a timely notice of appeal on November 2, 2023. Fed. R. App. P. 4(b). 3-ER-525.

### III.  Bail Status

On October 30, 2023, Mr. Centeno received a sentence of 46 months in custody. He is currently detained at FCI Victorville Medium in Victorville, California. His expected release date is September 13, 2026.

## ISSUES PRESENTED FOR REVIEW

**I.  Whether the district court's failure to conduct the third step of *Batson* requires remand.**

**II.  Whether the district court erred in excluding any mention of the medication Olanzapine.**

## CONSTITUTIONAL AND STATUTORY PROVISIONS

The Fifth Amendment of the Constitution provides in relevant part:

> No person shall . . . be deprived of life, liberty, or property, without due process of law.

The Sixth Amendment of the Constitution provides in relevant part:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

Section 1326(a) of Title 8 provides in relevant part:

4

Any alien who . . . has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter . . . attempts to enter the United States . . . shall be fined under title 18, or imprisoned  . . .

Federal Rule of Evidence 401 states:

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.

Federal Rule of Evidence 403 states:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Federal Rule of Evidence 801 states:

Hearsay is a statement the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement.

## STATEMENT OF THE CASE

On November 5, 2022, Jaime Centeno walked up to the pedestrian primary inspection booth at the San Ysidro Port of Entry. 2-ER-242. He handed the officer a ripped piece of paper with a copy of his California identification card. 2-ER-243.

Inputting the biographical information on that ripped piece of paper into the database, the officer learned that Mr. Centeno had a prior immigration violation. 2-ER-246. At no point during his interaction at the port of entry—at primary, secondary, or during his

5

interview—did Mr. Centeno try to flee or evade arrest. 2-ER-242, 262–63, 3-ER-329.

The government charged Mr. Centeno with attempted reentry after deportation under 8 U.S.C. § 1326(a) and (b), and his case proceeded to trial. 3-ER-508. Mr. Centeno based his defense on a lack of intent to enter the United States free from official restraint. 2-ER-210. Rather than having the intent to go at large in the community, Mr. Centeno sought to show that he intended to get arrested at the Port of Entry so he could obtain medication, specifically Olanzapine, while in custody.

As described further below, however, Sixth Amendment and evidentiary problems arose during trial.

## I.  The court denied Mr. Centeno's *Batson* objections without reaching the third step.

During jury selection, the district court brought thirty-eight individuals into the courtroom and asked the potential jurors to introduce themselves. 2-ER-86. The court followed up with questions such as: is there any reason you could not be a fair and impartial juror, 2-ER-87; does anybody in your family or close to you work in law enforcement, 2-ER-96; do you have any experience going back and forth to Mexico 2-ER-98; and have you ever been referred to secondary inspection from the primary screening, 2-ER-109.

After voir dire, the court struck six jurors for cause, two of which were on the government's motion. 2-ER-172–73. Of the two the government moved to strike, one was a female juror. *Id.* The government then used four of its six peremptory challenges to strike female jurors.

The defense made a *Batson* motion on the basis of sex. 2-ER-199. Initially, the court denied the motion after a two-sentence exchange with government counsel:

> THE COURT: Did you have -- did you have valid reasons for your selections?
>
> [THE PROSECUTOR]: Yes, your Honor.
>
> THE COURT: The Court denies the *Batson* motion. Thank you.

2-ER-199.

Possibly concerned about the brevity of this exchange, the prosecutor later asked to supplement the record to offer reasons for striking the female jurors. 2-ER-214.

For Juror 15, the government explained that it "struck her because she did have a negative experience with Secondary Inspection. Every time she gets sent to Secondary, she is wondering why. We didn't want that to affect her ability to kind of assess our CBP officer witnesses in this case." 2-ER-215.

For Juror 18, the government said it struck her because she "had an opinion regarding deportation that was somewhat negative. She felt

7

that some of the deportations were 'unjust' and even though she said she could set her opinions aside, we felt that her negative experiences and belief that it was unjust would also bias her opinion of this case." *Id*.

For Juror 24, the government explained, "she said she would comply with the law but had bad experiences or negative experiences because she had friends whose parents were deported, and she would like to be unbiased, but she didn't necessarily agree that the parents were rightfully deported." *Id*.

For Juror 25, the government said, "the woman who . . . recently started a new job, a promotion, and she said that she might have a 'psychological issue' even if her employer had no issues with being here. She herself would be thinking about work." *Id*. at 2-ER-216.

After each of the first three proffers for Jurors 15, 18, and 24, the court responded identically: "The Court believes that's a fair explanation." 2-ER-215. After the final proffer for Juror 25, the court responded similarly: "The Court believes that's a fair explanation and a nondiscriminatory reason." 2-ER-216.

The government's proffered reasons for striking Jurors 15 and 25, however, were not supported by the record. For example, the "psychological issue" mentioned by Juror 25 was expressed only after the court asked her if she had any issues with time. *Id*. Even then, the exact quote from Juror 25 when asked if she would have an issue with

8

time was, "I think psychologically for me, but my organization is fine with me being here." 2-ER-152. Juror 25 explained that the psychological issue was because in addition to being a juror, she was "going to work some nights." *Id*. But she assured the court that she could "absolutely" listen to the evidence if selected as a juror. *Id*.

The proffer for Juror 15 was similarly misrepresented. At no point did Juror 15 indicate she had a "negative experience" with secondary inspection. Instead, she explained that "[i]t was kind of confusing because I didn't understand why I had to keep doing it. And, so, every time I would go over to Mexico, I would have to go to Secondary. And, so, I just wondered why." 2-ER129. Although she wondered why she would be sent to secondary, she noted that she would not "view that negatively" against the government. *Id*.

Despite other male jurors in the venire expressing similar views to female Jurors 25 and 15, the men were not stricken. For example, Jurors 2 and 28 also expressed timing issues. 2-ER-90, 160. When the court asked Juror 2 whether he had any timing issues, he said, "I'm currently taking a couple of summer classes right now." 2-ER-90. When Juror 28 was asked the same timing hardship question, he said, "[b]esides my wife not wanting me to be here and on a plane to Vancouver, no." 2-ER-160. Yet the government chose not to strike them.

There were also three other male jurors (Jurors 3, 13, and 35) who were employed with their own jobs to think about, yet the prosecution

did not strike them. Juror 3 explained he worked as a "an industrial hygienist at UC San Diego." 2-ER-93. Juror 13 worked as a "program manager in the diagnostic reagents manufacturing space." 2-ER-124. And Juror 35 worked as a "[r]estaurant host" at a resort. 2-ER-180. Even taking the government's explanation without comparison to other jurors, the proffered reasons for striking Juror 25—concerns with work—were unrelated to the case.

## II. The district court prohibited Mr. Centeno from introducing evidence relating to his history with a specific medication.

Mr. Centeno's defense at trial was that he did not have the specific intent to enter the country free from official restraint. 2-ER-210. As the court instructed the jury, "[a] person has the intent to enter the United States free from official restraint only if he has the intent to enter the United States without being detected, apprehended, or prevented from going at large within the United States and mixing with the population." 3-ER-476.

The following evidence introduced at trial supported Mr. Centeno's defense. When Mr. Centeno came to the port of entry, he had minimal belongings. 2-ER-210, 3-ER-348. Among those belongings was a ripped copy of his California identification card, several copies of his Mexican birth certificate, and various documents relating to his time in prison and immigration custody. 3-ER-338–47. At trial, he was able to elicit that among the limited items Mr. Centeno had with him at

arrest, there was a medication list from the last time he was in custody. 3-ER-345–46, 357. The defense investigator also testified that Mr. Centeno carried with him an address book. 3-ER-358. The doctor of the Metropolitan Correctional Center ("MCC") where Mr. Centeno was held also testified that Mr. Centeno was prescribed and administered medication once in custody. 3-ER-406.

But despite that testimony, the district court did not allow Mr. Centeno to show that each one of those documents contained a reference to the same medication. 3-ER-393–94. Instead, the court instructed the defense to only elicit whether medications, generally, were proscribed to Mr. Centeno at the jail. 3-ER-392. She prohibited any mention of Olanzapine, which would have connected the medicine Mr. Centeno was previously prescribed to the medicine that was written in his address book and the medicine he actually received after he was arrested. 2-ER-306, 3-ER-392. Although the record is not completely clear, it appears that the court did so under theories of relevance, Federal Rule of Evidence 403, and hearsay. *Id.*

The items Mr. Centeno carried with him provided valuable insight as to his intent because Mr. Centeno showed up to the port of entry with minimal belongings. He did not have luggage, a cellphone, or even cash with him. 2-ER-210, 3-ER-348. Instead, all he had with him was a ripped copy of his California identification card; multiple copies of his Mexican birth certificate, Bureau of Prisons ("BOP") and Immigration

and Customs Enforcement ("ICE") identification cards; and most importantly, the prior prescription for Olanzapine he received in custody and his address book with the Olanzapine dosage. 3-ER-338–47.

In other words, Mr. Centeno wanted to show that he lacked an intent to go "at large" in the United States—rather, he intended to go into custody so he could receive the same medicine he had in the past. The two items he had with him—the medical records with his Olanzapine prescription from the past and the address book with an Olanzapine dosage—provided evidence of this. 3-ER-382. And his defense was even stronger given that he actually received the same drug in the jail that housed him upon his arrest for this offense, which showed his belief that he would obtain Olanzapine if arrested was not unfounded. *Id.*

Without the references to Olanzapine in his previous medical records and the address book, nothing connected the medicine Mr. Centeno had received in the past with the medicine written in his book with the medicine he was prescribed when he returned. *Id.* The jury convicted Mr. Centeno, and the court sentenced him to 46 months in custody. 1-ER-2–3, 3-ER-500. This appeal follows.

### SUMMARY OF ARGUMENT

This Court must remand because the trial court failed to conduct a full *Batson* inquiry and unjustifiably precluded Mr. Centeno from introducing admissible evidence.

First, during jury selection, the prosecutor struck six people with peremptory challenges—four of them were women. In response, the defense challenged whether those strikes violated Batson. The defendant must first "make a *prima facie* showing that a peremptory challenge has been exercised" on the basis of gender. *Snyder v. Louisiana*, 552 U.S. 472, 476 (2008). Second, the prosecution must offer "[gender]-neutral reasons" for its peremptory strikes. *Id.* at 477. After the prosecution proffers its reasons, "the court is required to evaluate 'the persuasiveness of the justification.'" *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc) (quoting *Purkett v. Elem*, 514 U.S. 765, 767 (1995)). Third, the court must evaluate whether the defendant has shown "purposeful discrimination." *Batson*, 476 U.S. at 98.

The district court erred when it conducted the step two analysis but ended the inquiry there without engaging in a step three analysis. The court's only comments—that the prosecutor's statements were a "fair explanation" and "nondiscriminatory"—were directed at the second step. 2-ER-215–16. Because the district court failed to conduct step three of *Batson*, the correct remedy is for this case to be remanded so a proper *Batson* inquiry can take place. But even if this Court were to

13

conduct a third step analysis *de novo*, an examination of the full *voir dire* demonstrates that the government's proffered reasons for striking jurors 15 and 25 were a pretext for discrimination.

Second, the court erred in excluding any mention of the medication Olanzapine. The reference to Olanzapine in the three key pieces of evidence—the prior prescription from Mr. Centeno's incarceration, the annotation embedded in his address book, and the prescription and administration of daily doses of Olanzapine upon arrest—were not offered for the truth of the matter asserted and thus were not hearsay. This evidence was relevant given his defense that he was coming to get arrested to obtain Olanzapine in custody just like he had received last time. And any mention of Olanzapine was far more probative than prejudicial. Even if it was not, Mr. Centeno's right to present a defense required the admission of this evidence. The court improperly limited Mr. Centeno's ability to present that defense, as the medication was the link needed to make that defense plausible.

## ARGUMENT

### I. The district court's failure to conduct step three of the *Batson* analysis after hearing the prosecutor's reasons for striking four female jurors requires remand.

The Supreme Court has repeatedly held that the "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers v. Mississippi*, 588 U. S. 284, 303 (2019). A

14

discriminatory purpose includes discrimination based on gender. *J. E. B. v. Alabama ex rel. T. B.*, 511 U. S. 127, 128 (1994).

Courts use a three-step procedure to assess if a prosecutor's actual reason for striking a juror is constitutional. *Batson*, 476 U.S. at 96–100. At the first step, the defendant must "make a *prima facie* showing that a peremptory challenge has been exercised" on the basis of gender. *Snyder*, 552 U.S. at 476.

At the second step, if the defendant makes such a prima facie case, "the burden shifts to the [prosecution] to explain adequately the [gender] exclusion by offering permissible [gender]-neutral justifications for the strike." *Shirley v. Yates*, 807 F.3d 1090, 1095 (9th Cir. 2015).

At the third step, if a gender-neutral "explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful [gender] discrimination." *Id*. To make this decision, "the court is required to evaluate 'the persuasiveness of the justification.'" *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc) (quoting *Purkett v. Elem*, 514 U.S. 765, 767 (1995)). This is a "searching" process, *Rice v. Collins*, 546 U.S. 333, 337 (2006), that involves "'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available,'" *United States v. Alanis*, 335 F.3d 965, 968 n.2 (9th Cir. 2003) (quoting *Batson*, 476 U.S. at 93).

In this case, the district court conducted a step two analysis but never went to step three. Specifically, the court merely determined that

the prosecutor had "fair" gender-neutral reasons for striking jurors, but never determined whether those "fair" or "nondiscriminatory" reasons were pretexts for purposeful discrimination. 2-ER-215–16. And the court's failure to answer the step three question is particularly important because "it does not matter that the prosecutor might have had good reasons" for striking certain jurors; "[w]hat matters is the real reason they were stricken." *Johnson v. California*, 545 U.S. 162, 172 (2005) (alterations in original) (quoting *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004)).

## A. The standard of review is *de novo*.

When considering whether the government unconstitutionally struck a juror, this Court "review[s] de novo whether a prosecutor's proclaimed reason for exercising a peremptory challenge was an adequate explanation." *United States v. You*, 382 F.3d 958, 967 (9th Cir. 2004). And this Court "review[s] de novo whether the district court properly applied *Batson*." *United States v. Alvarez-Ulloa*, 784 F.3d 558, 565 (9th Cir. 2015). That includes whether "the court improperly applied the three-step framework." *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1163 (9th Cir. 2022) (internal quotations omitted).

## B. The court only addressed the first two steps of *Batson* and did not conduct a step three analysis.

The district court erred when it concluded, with no further analysis, that the prosecutor provided "a fair explanation" or "a fair

explanation and a nondiscriminatory reason" for striking female jurors. 2-ER-215–16.

After Mr. Centeno made his first-step prima facie showing under *Batson*, the court moved to the second step by asking whether the government had "valid reasons for your selections." 2-ER-199 Although the court initially denied the *Batson* challenge based only on the prosecutor's simple reply of "yes," eventually the government provided its reasons for the strikes of each of the four female jurors. *Id*; 2-ER-216.

After each of the first three explanations, the court responded: "The Court believes that's a fair explanation." 2-ER-215. For the fourth juror, the court responded: "The Court believes that's a fair explanation and a nondiscriminatory reason." 2-ER-216. The inquiry ended there. The court never proceeded to step three or determined whether the "stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike." *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008).

This Court has found that similar statements did not reach the step three inquiry. In *Alanis*, the trial court also dealt with a gender-based *Batson* challenge. 335 F.3d 965 (9th Cir. 2003). The court responded to the government's reasons by stating that it offered a "plausible explanation" that was "grounded other than in the fact of gender of the person struck." 335 F.3d at 967.

This Court held that "the district court erred by failing to proceed to step three to evaluate meaningfully the persuasiveness of the prosecutor's gender-neutral explanations." *Id*. at 969. While the government argued that the trial court's use of the word "plausible" showed that it had conducted a step three analysis, this Court disagreed. *Id*. "It is not enough that the district court considered the government's gender-neutral explanations 'plausible.'" *Id*. Rather, to move on to step three, "it is necessary that the district court make a deliberate decision whether purposeful discrimination occurred." *Id*.

Here, the district court used the word "fair," instead of the word "plausible" used in *Alanis*. 2-ER-215–16. But its failure to "evaluate meaningfully" the prosecutors' reasons and make the "necessary" and "deliberate decision whether purposeful discrimination occurred" was equally deficient. *Id*. Accordingly, the district court here did not conduct the "required sensitive inquiry" into the prosecutors' motives. *Alanis*, 335 F.3d at 969 n.3.

Another case where a district court did not reach third step was *United States v. Alvarez-Ulloa*. 784 F.3d 558 (9th Cir. 2015). There, the court examined the reasons for each strike and found that the reasons were "facially neutral" but "conducted no further analysis." *Id*. at 565. This Court held that the trial court erred by failing to evaluate the "persuasiveness" of those "facially neutral reasons." *Id*. at 565. In doing so, the trial court failed to conduct a step-three *Batson* analysis. *Id*.

18

Like the district court in *Ulloa-Alvarez*, the district court here did not evaluate the persuasiveness of the government's reasons. Instead, it merely found the reasons to be "facially neutral" by stating that the reasons were "a fair explanation" or "a nondiscriminatory reason." 2-ER-215–16. Without the persuasiveness analysis, the court erred in the same way the district courts in *Ulloa-Alvarez* and *Alvarez* did by failing to reach the third *Batson* step.

### C. This Court should remand for the district court to conduct *Batson's* third step.

This Court recognizes that "[o]rdinarily, it is for the trial court, rather than for the appeals court, to perform the third step of the *Batson* process in the first instance." *Alanis*, 335 F.3d at 969. In those cases, this Court "may remand to the district court, either for a factual hearing or for a new trial." *Ulloa-Alvarez* 784 F.3d at 566. That is particularly appropriate when the record is not "well-developed." *Id.* at 567; *see also United States v. Nishida*, No. 20-10238, 2021 WL 3140331, at *1 (9th Cir. July 26, 2021) (unpublished) (where the district court never conducted the third step of Batson, this Court remanded for the district court to conduct the third step in the first instance).

Moreover, conducting a third step analysis on appeal would be inconsistent with at least some other circuits. For example, the Sixth Circuit has held that "trial courts, not appellate courts, are to assume the responsibility of making factual determinations regarding . . . the

19

ultimate existence of purposeful discrimination." *Harris v. Harberlin*, 526 F.3d 903, 913 (6th Cir. 2008).

Although there are not "specific procedures a trial court must follow at step three," this Court has held that, "[a]t a minimum, this procedure must include a clear record that the trial court made a deliberate decision on the ultimate question of purposeful discrimination." *Alanis*, 335 F.3d at 968 n.2. "In an ideal setting, a court would use most, if not all, of [its evidentiary] tools in evaluating a *Batson* motion." *Id.* (citation omitted).

The district court here failed to even commence the third step of *Batson* because it made no inquiry into any direct or circumstantial evidence that would prove the reasons stated were nondiscriminatory or pretextual. Even after the prosecutor provided the supplemental reasons for the strike of each juror, the district court failed, a second time, to conduct the third step of *Batson*. The district court's comments went to step two of *Batson*, not step three.

Because the record lacked any development from the prosecutor or the court, the appropriate remedy is to remand for the court to "perform the third step of the *Batson* process in the first instance." *Alanis*, 335 F.3d at 969.

**D.** **Alternatively, *de novo* review demonstrates that the prosecutor's explanations for striking Jurors 25 and 15 were pretext for purposeful gender discrimination.**

Alternatively, a *de novo* review of the prosecutor's reasons for striking Juror 25 and Juror 15 reveals that they were "pretexts for purposeful discrimination." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). Several factors used to determine "whether racial discrimination occurred" are present here. *Flowers*, 588 U.S. at 301. The "statistical evidence about the prosecutor's use of peremptory strikes" showed the prosecutor struck four women but just two men. *Id.* at 302. The prosecutor made "misrepresentations of the record when defending the strikes" of the two women. *Id.* A "side-by-side comparison[]" of Juror 25 with prospective male jurors who were not struck demonstrates that she was similarly situated to them. *Id.* And the reason for striking Juror 25 had no relevance to the case being tried.

1. **The prosecutor's explanation for striking Juror 25 was a pretext for purposeful discrimination.**

The prosecutor explained that she struck Juror 25 because she "recently started a new job, a promotion, and she said that she might have a 'psychological issue' even if her employer had no issues with being here. She herself would be thinking about work." 2-ER-216. This reason, however, was a pretext for discrimination. Not only did the prosecutor misrepresent the record, the prosecutor did not strike men from the pool who had provided similar timing hardships or were also

employed. The proffered reason for the strike was also unrelated to Mr. Centeno's case. "Had the court properly proceed to step three, it would have concluded that the prosecutor's gender-neutral explanations were pretexts for purposeful discrimination[,]" which constitutes reversible error. *Alanis*, 335 F.3d at 970.

First, the prosecutor misrepresented the record. Juror 25 mentioned her "psychological issue" only after the court asked if she had any issues with time. 2-ER151. Even then, Juror 25's exact quote was, "I think psychologically for me, but my organization is fine with me being here." 2-ER-152. Juror 25 explained that the psychological issue was because in addition to being a juror, she was "going to work some nights." *Id*. But she assured the court that she could "absolutely" listen to the evidence if selected as a juror. *Id*.

In *Miller-El v. Dretke*, the Supreme Court recognized that a defendant could present evidence that the prosecutor "mischaracterized" a juror's response when making a *Batson* challenge. 545 U.S. 231, 244 (2005). Even when there was a possibility that the prosecutor "perhaps misunderstood" the response, the Court nevertheless found that mischaracterization could be a pretext for discrimination. *Id*.

The Court here, as in *Miller-El*, may consider the prosecutor's mischaracterization of Juror 25's responses. At no point did Juror 25 indicate that she had an issue with the case or being a juror. Rather her

psychological issue stemmed from what would occur *after* jury duty because she was "going to work some nights." 2-ER-152. Even so, this issue dissipated when the court inquired whether she could still listen to the evidence if selected, and she responded "absolutely." *Id*.

Another tool the Court can use is a "comparative juror analysis" by doing a side-by-side comparison of "the characteristics of a struck juror with the characteristics of other potential jurors, particularly those jurors whom the prosecutor did not strike." *Collins*, 551 F.3d 914, 921 (9th Cir. 2009). Practically, that means that "[i]f a prosecutor's proffered reason for striking a [female] panelist applies just as well to an otherwise-similar [male] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El v. Dretke,* 545 U. S. at 241.

A comparative juror analysis of female Juror 25 and male Jurors 2 and 12 also show that the government's proffered reason of a timing hardship for Juror 25 was pretextual. Although male Juror 12 also expressed a timing hardship, the prosecutor chose not to strike him. Specifically, Juror 12 indicated that he had a preplanned trip to Vancouver that he had to cancel. 2-ER-160. Male Juror 2 also had a timing issue. He indicated that he was taking summer school classes, yet the prosecutor did not strike him. 2-ER-90. And at least three other men, Jurors 3, 13, and 35, were also employed at the time and had their

own jobs to think about, yet the prosecution did not strike them. 2-ER-93, 124, 180.

Courts have rejected similar work-related excuses as pretextual. For example, the prosecutor in *Kesser v. Cambra* offered a timing hardship reason when it struck a Native American juror from the venire. 465 F.3d at 363. There, the Court conducted a comparative juror analysis and found that the prosecutor's proffered reasons were pretextual for discrimination because there were others who "were allowed to serve despite their reluctance to leave work[.]" *Id*.

Like the prosecutor in *Kesser*, the prosecutor's proffered statement was pretextual because at least two other male jurors had timing hardships. Additionally, three other male jurors were also employed and could "be thinking about work" in the same manner as Juror 25. 2-ER-216. Had the prosecutor's reasons for striking the women been "genuine and not merely pretextual, the prosecutor would have excluded [men] on the same basis." *Alanis*, 335 F.3d at 969.

In addition to the fact that the prosecutor's stated reasons also applied to other jurors, the reasons were pretextual because they were unrelated to the case. At *Batson's* third step, "the trial court must decide not only whether the reasons stated are race-neutral, but whether they are relevant to the case," *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008), or "related to the particular case to be tried," *Batson*, 476 U.S. at 98. For instance, in *Kesser*, the prosecutor stated

24

that he struck a juror because she was "pretentious . . . and self-important." 465 F.3d at 362. This Court held that without an "explanation about how this would render her unsuitable for the jury," it was pretextual because it was unrelated to the case to be tried. *Id*. at 364.

Like the reason proffered in *Kesser*, the reason proffered for using a peremptory strike on Juror 25—that she "would be thinking about work"— had nothing to do with the case being tried. 2-ER-216. Mr. Centeno's case involved the border and seeking medication and shelter, not work.

### 2. The prosecutor's explanation for striking Juror 15 was a pretext for purposeful discrimination.

As stated, a misrepresentation undermines the legitimacy of a prosecutor's stated reasons. For Juror 15, the government explained that it "struck her because she did have a negative experience with Secondary Inspection. Every time she gets sent to Secondary, she is wondering why. We didn't want that to affect her ability to kind of assess our CBP officer witnesses in this case." 2-ER-215. This explanation was pretext for discrimination because it was not supported by the record. Specifically, Juror 15 did not have a "*negative* experience with Secondary Inspection," *id*., instead what she said was that it was "kind of confusing." 2-ER-129 (emphasis added).

Courts cannot "accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." *Johnson v. Vasquez*, 3 F.3d 1327, 1331 (9th Cir. 1993). "[I]f a review of the record undermines the prosecutor's stated reasons, . . . the reasons may be deemed a pretext for racial discrimination." *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003).

The record belies the government's proffered reasons for striking Juror 15. Her experience at secondary was "confusing" only because she "just wondered why" she was referred. 2-ER-129. But she also clarified that if selected as a juror, she would not "view that negatively with the Government." *Id*. Though the government stated that it did not want Juror 15's experience of being sent to secondary to affect her assessment of the CBP officers, the record shows that Juror 15 did not have any views of those officers. Further, Juror 15 specifically stated that she would not use her experience to view the government "negatively." *Id*.

The reasons proffered are both undermined and refuted by the record. When looking at the record, it shows that the reasons stated by the prosecutor were pretext for discrimination. Thus, this Court should either remand for the district court to conduct a proper *Batson* analysis or else find that the government's proffered reasons for striking jurors 15 and 25 were a pretext for discrimination.

## II. The district court erred in excluding any mention of the medication Olanzapine.

Although Mr. Centeno was allowed to introduce evidence that he took medication, he was not allowed to introduce evidence of the specific medication Olanzapine. 3-ER-392–94. This prevented him from showing a connection between the medicine he was previously prescribed, the medicine written in his book, and the medicine he received after he returned. This exclusion was contrary to the rules of evidence and violated his right to present a defense.

### A. Standard of review is *de novo*.

Generally, evidentiary rulings are reviewed for abuse of discretion. *United States v. Emmert*, 829 F.2d 805, 808 (9th Cir. 1987). The Court's construction of the Federal Rules of Evidence, however, is reviewed *de novo*. *Id.* at 810. The Court also reviews *de novo* whether evidentiary rulings unconstitutionally interfered with the defendant's right to present a defense. *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010).

### B. The name of the medication Olanzapine was admissible under the rules of evidence.

At trial, Mr. Centeno attempted to introduce several items or testimony that linked him to the medication Olanzapine. This included: (i) a reference to Olanzapine on a document from his prior time in custody that he carried with him on the day of arrest; (ii) a reference to Olanzapine in his address book that he also carried with him on the day

of arrest; and (iii) that he was proscribed Olanzapine while in custody after his arrest in this case.

The district court allowed references to "medications" generally but prohibited Mr. Centeno from eliciting the word 'Olanzapine' from any document or witness. 3-ER-392–93. Although the record is not a model of clarity, it appears the judge agreed with the government that the references to Olanzapine were irrelevant, unfairly prejudicial, and constituted hearsay. 1-ER-19, 20, 59, 67; 2-ER-80; 3-ER-389, 423, 425. These rulings, however, misinterpreted the rule of evidence and violated Mr. Centeno's right to present a defense.

### 1. Reference to Olanzapine is highly relevant.

For evidence to be admissible, it must be relevant. *See* Fed. R. Evid. 401. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id*. Relevant evidence is presumptively admissible. Fed. R. Evid. 402.

The government conceded at trial that the central issue in the case was Mr. Centeno's intent. Specifically, in its closing argument it recognized that "the Defendant presented evidence to imply that he wanted to be taken into custody because he wanted to seek medical treatment." 3-ER-451. And although the court also recognized that Olanzapine was "part of [Mr. Centeno's] theory of defense," it

nevertheless prohibited Mr. Centeno from referencing the name of the medication. 3-ER-424–25.

The three pieces of evidence with the word 'Olanzapine' on them were highly relevant given that they were part of Mr. Centeno's theory of defense. First, Mr. Centeno had a document from a prior correctional facility that had his name, date of birth, and listed medications. 3-ER-345–46, 357. On that list was Olanzapine. This evidence is highly relevant because it makes a fact of consequence—that Mr. Centeno's intent was to obtain Olanzapine at arrest—more probable since he received it last time he was in custody. Importantly, this document was an item that Mr. Centeno carried with him when he was arrested in the instant case. 3-ER-345–46, 357.

Second, Mr. Centeno also carried with him an address book containing many handwritten annotations, including the word 'Olanzapine.' 3-ER-358. This evidence was also highly relevant because it, too, made it more probable that Mr. Centeno's intent was to get arrested to obtain Olanzapine. The items found on his person are an indicator of what was important to have with him when he got to the border—i.e., not a luggage or phone, but a reference to the medication he had previously received.

Finally, though not found on his person, was the document from the Metropolitan Correctional Center showing that Mr. Centeno was indeed prescribed and administered the same drug once he was

arrested in the instant case. 3-ER-406. The relevance here is the same. It makes it more probable that Mr. Centeno's intent was to be arrested to obtain Olanzapine, since that is exactly what happened. Together, these three key pieces of evidence made Mr. Centeno's theory of defense more probable because it connected the medication he had taken in the past with the medication he wanted to receive in the future.

Moreover, Olanzapine is not an over-the-counter drug such as Tylenol that is readily accessible. Merely hearing the name of a specific prescription medication, without even explaining what it was for, would have added a level of plausibility to Mr. Centeno's defense. Instead, hearing the general term 'medication' likely left the jury questioning why Mr. Centeno could not simply obtain what he was seeking at a pharmacy in Mexico. Nor did it connect the dots between the medication he was previously prescribed, the medication written in his address book, and the medication he again received after he was arrested.

### 2. The reference to Olanzapine was not unduly prejudicial.

The evidence referencing Olanzapine was not only relevant under Rule 401, it was also admissible because it is not unduly prejudicial under Rule 403.

A court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Thus, relevant evidence can nevertheless be inadmissible, but "its exclusion must rest not on the ground that the other evidence has rendered it 'irrelevant,' but on its character as unfairly prejudicial, cumulative or the like, its relevance notwithstanding." *Old Chief v. United States*, 519 U.S. 172, 179 (1997). Unfair prejudice is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Anderson*, 741 F.3d 938 (9th Cir. 2013) (citations and internal quotation marks omitted).

The relevance and probative value of Olanzapine outweighs any undue prejudice. As noted above, the probative value is that the word 'Olanzapine' connected Mr. Centeno's theory of defense by linking the medicine he was taking during his previous incarceration with the medicine listed in his book with the medicine he later received after his arrest actual and gave it value. Furthermore, two of the three items were found on his person, and the third came directly from the jail where he was housed. 3-ER-357–58, 406.

For all three key pieces of evidence, the prosecutor and the court cited to the confusion it would have caused the jury as the undue prejudice "because of the dates and everything else." 3-ER-394. The court limited the testimony to allow Mr. Centeno to mention "medications" but not Olanzapine. But there need not have been any

confusion with "dates" or "anything else" because any confusing details could have been redacted.

This Court has recognized that "Rule 403 is 'an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence.'" *United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir. 1995) (citing *United States v. Patterson*, 819 F.2d 1495, 1505 (9th Cir. 1987)). In *Mende*, the Court found that testimony that one of the defendants had been warned that the co-defendant had been "previously involved in a similar fraudulent scheme" was not unduly prejudicial. *Id.* at 1301. In doing so, the Court noted that for Rule 403 to apply, the "danger of prejudice must not merely outweigh the probative value of the evidence, but *substantially* outweigh it." *Id.* at 1302. In conducting the balancing test, the Court found that the statement was "clearly probative" of the defendant's knowledge—an issue in the case. *Id.* It further held that "any resultant prejudice was minimized by the limiting instruction." *Id.*

Similar to the statement in *Mende*, the statement here was "clearly probative" of Mr. Centeno's specific intent, which was the integral issue in this case as both the prosecutor and the district court recognized. 3-ER-424–25, 451. The prejudice the prosecutor cited (confusing "dates and everything else") could have been minimized, as in *Mende*, with redactions or a limiting instruction. *Mende*, 43 F.3d at 1302. The court could have created further safeguards by ordering the

32

parties not to discuss the dates or the items included in "everything else." Notably, where the government fails to "argue any specific prejudice that may have resulted" from a piece of evidence, this Court has "conclude[d] that the district court abused its discretion by excluding it." *United States v. Vallejo*, 237 F.3d 1008, 1021–22 (9th Cir. 2001), *opinion amended on denial of reh'g*, 246 F.3d 1150 (9th Cir. 2001).

Mr. Centeno wanted to show that Olanzapine, which he believed he would receive once arrested, was the same drug as the one listed on a prior medication list from his past time in custody and the same drug found in his address book. And it was the same drug listed on the medications he received from jail where he was housed after his instant arrest. He did not intend to get into whether it was a psychotropic medication or the symptoms the medication addressed. He was simply trying to show that he wanted to obtain the same medicine he had received in the past. Therefore, because Olanzapine was relevant, probative, and not unduly prejudicial, the district court erred in denying Mr. Centeno the ability to mention it.

### 3. Because Olanzapine was not offered to prove the truth of the matter asserted, it was admissible as nonhearsay evidence.

Hearsay is an out of court statement offered "to prove the truth of the matter asserted" and is inadmissible. Fed. R. Evid. 801(c). Evidence not offered for its truth is not hearsay. *Id*. For example, a statement

33

used "to establish that the statement was made or to demonstrate the effect the statement had on the hearer" is not hearsay because it is not being offered for its truth. *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir. 1988).

The word 'Olanzapine' was a statement on the list of medications Mr. Centeno received during his prior incarceration and also appeared in his address book. That statement, however, was not being offered for its truth—that the medicine he was prescribed in the past was, in fact, the specific drug Olanzapine. Rather it was being offered to establish that he had two documents in his possession that listed *the same* prescription medicine and that he was later prescribed *that same* medication. This would have shown that Mr. Centeno returned to the United States to be arrested so he could obtain the *same* medication— regardless of whether the medication in question was Olanzapine or some other drug.

Other cases have made similar distinctions when deciding whether the contents of a statement were offered for the truth of the matter asserted. In *Kirk*, for instance, the statement made was that the defendant told the witness "that there was a camera and a single girl in the bank which was robbed." 844 F.2d at 678. This Court explained that the statement was nonhearsay because it was not being offered to prove that the bank indeed had a camera with a single girl. *Id*. The truth was not at issue in the case. *Id*. Instead, the statement was being offered to

34

prove that the defendant made the statement, as part of a perjury trial, and that the statement was inconsistent with his testimony under oath. *Id.*

Other circuits have done the same. in *United States v. Lieberman*, 637 F.2d 95 (2d Cir. 1980), the Second Circuit affirmed admission of a hotel guest card for the non-hearsay purpose that a person claiming to have the name of a coconspirator registered at the hotel. The government then admitted "other evidence . . . from which the jury could infer that the hotel card spoke the truth." *Id.* at 101. Other courts have taken a similar approach. Similarly, in *United States v. Chavez*, 229 F.3d 946, 953–54 (10th Cir. 2000), the Tenth Circuit held that a scrap of paper containing a phone number was admissible "for the non-hearsay purpose of linking the co-conspirators," even though it "could not have been submitted for the truth of the matter asserted." And in *United States v. Gaitan-Acevedo*, 148 F.3d 577, 591 (6th Cir. 1998), the Sixth Circuit explained that where the government "offered the numbers and addresses to demonstrate, in conjunction with other evidence, that members of the conspiracy associated with each other for business purposes," the documents were "not offered to prove the information they contained and therefore, may not be excluded as hearsay." Like the statements in these cases, the statement here was not offered for its truth. The truth of the statement—that the medication Mr. Centeno was prescribed and administered was the

specific drug Olanzapine—was not at issue in the trial. The question was whether Mr. Centeno reentered to obtain the *same drug he had previously received*, not whether he reentered to obtain the specific drug Olanzapine. Showing that he had previously received the same drug would make it more plausible that he knew the effects of this drug, knew it had helped him in the past, and knew that if he were arrested, he would likely receive it again. This would be true regardless of whether the drug were Olanzapine, Valium, Viagra, or any other prescription drug. "The fact *of* the statement is relevant; the truth of the facts *in* the statement is irrelevant." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 779 (9th Cir. 2002) (quoting Edward J. Imwinkelried, *Evidentiary Foundations* 312 (4th ed. 1998)) (emphasis in original). Because Mr. Centeno carried documents with the word 'Olanzapine' with him, it provided valuable insight as to his intent. Mr. Centeno did not have luggage, a cellphone, or even cash with him. Instead, all he had was a ripped copy of his California identification card; multiple copies of his Mexican birth certificate, BOP and ICE identification cards; and most importantly, the prior prescription for a medication he received in custody and his address book with the dosage for the same drug. 3-ER-338–47. In other words, Mr. Centeno believed that incarceration meant receiving the same drug that had helped him in the past.

36

### C. Even if the district court properly excluded the mention of Olanzapine under the rules of evidence, it was nevertheless admissible under Mr. Centeno's constitutional right to present a defense.

Even if one or more of these specific pieces of evidence should not have come in under the Federal Rules of Evidence, "[t]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

The district court denied Mr. Centeno the ability to present the testimony of witnesses who would speak to his specific intent to be arrested—a defense to the crime alleged. This Court has found constitutional error when evidence intended to contradict the theory of a prosecution of motive is excluded. *See United States v. Whitman*, 771 F.2d 1348, 1351 (9th Cir. 1985).

For example, in *United States v. Boulder*, the defendant was charged with tax evasion. 384 F.3d 794, 798 (9th Cir. 2004). The prosecution's theory of the case was that he was siphoning monies to his wife and failing to report the money to the IRS. *Id.* at 803. The theory of defense was that the money given to his wife belonged to his company rather than him, so he was not required to report that money in his personal taxes. *Id.* In support of this defense, the defendant sought to introduce a state court judgment where a jury found, in an unrelated marital dispute, that the money belonged to the company and not the

defendant. *Id*. at 802. The district court denied the defendant the ability to admit that vital piece of evidence. *Id*. at 803. This Court, however, held that the district court constitutionally erred when it excluded the judgment because it was "crucial to [the defendant's] defense" and "directly contradicted the government's theory of the case." *Id*. at 808.

Mr. Centeno's theory of defense was that he did not have the specific intent to enter free from official restraint to go at large within the community. 3-ER-454. His intent was to be arrested so he could go into custody to gain access to Olanzapine, the medication he previously received in custody and believed he would receive again while in custody. The government's theory of the case was that he did have the requisite specific intent, meaning he wanted to enter undetected to go at large within the community. 3-ER-452. Because his intent was to be arrested and not go at large within the community, it was a defense to the crime.

Like the evidence in *Boulder*, the evidence regarding Olanzapine was crucial to the theory of defense and "directly contradicted the government's theory of the case." 384 F.3d at 808. Olanzapine, as opposed to medications in general, made the defense plausible.

Olanzapine was a medication Mr. Centeno knew he could obtain in custody in the United States because he had obtained that same medication during his last period of incarceration. He had the prior prescription to prove it. 3-ER-382. This is important because when he

38

was arrested, Mr. Centeno did not have much with him. He did not have luggage, a change of clothes, or even a cellphone. 2-ER-210, 3-ER-348. But he brought with him a prior prescription from a custodial facility, which listed that medication. 3-ER-382. He also had the medication prescription written down in his address book. *Id.* Mr. Centeno also wanted to admit medical records from the doctor in the jail where he was housed after arrest showing his belief was true— that he was given the same medication after he went into custody. 3-ER-406.

Instead, the court hampered Mr. Centeno's ability to present a full defense by prohibiting him from referencing Olanzapine and denying him the ability to admit into evidence the medical Administration Record that confirmed he previously received the same drug in custody. It merely allowed him to state that he was given medication in custody and that there were medications in his address book—without creating the necessary connection between the two.

Therefore, even if the court properly excluded Olanzapine under any of the theories of evidence previously mentioned, it should have nevertheless been admissible under Mr. Centeno's constitutional right to present a defense.

**D.  The government cannot prove that the district court's error was harmless.**

A district court's evidentiary error will be overturned if it is "more likely than not that the error affected the verdict." *United States v. Edwards*, 235 F.3d 1173, 1178 (9th Cir. 2000). On the other hand, if this Court finds that a violation of the right to present a defense has occurred, the conviction must be reversed unless the government establishes that the error was harmless beyond a reasonable doubt. *See United States v. Leal-Del Carmen*, 697 F.3d 964 975 (9th Cir. 2012).

The government cannot meet either standard. In denying Mr. Centeno the ability to elicit that he had been prescribed Olanzapine after his instant arrest, it diminished Mr. Centeno's defense that he was coming to get arrested because he believed that he would again receive Olanzapine. By showing that he did indeed receive the same medication he believed he would be prescribed in custody—the same medication listed on the prescription list and address book he had with him at the time of arrest—his defense was much more plausible. But the doctor who testified was prohibited from specifying the type of drug and did not testify to it being the same drug Mr. Centeno previously received. 3-ER-392, 406. Without it, the jury had no way of connecting the dots between the medicine he had previously received, the medicine he wanted to obtain, and the medicine he was actually prescribed after his arrest.

Even under the lower standard, prohibiting the mention of Olanzapine made it "more probable than not" that it affected the verdict because Olanzapine was not just any over-the-counter medication. The general term 'medication' is qualitatively different from specifically referencing Olanzapine. Permitting him to reference Olanzapine would have excluded other general medications such as Tylenol or Advil, which he could easily obtain without going into custody. This would have shown that Mr. Centeno lacked the necessary intent to enter the United States free from official restraint.

## CONCLUSION

Because the district court failed to conduct step three of *Batson* and improperly excluded evidence, this Court should remand.

Respectfully submitted,

Dated: February 18, 2025     */s/ Cindy V. Muro*

Cindy V. Muro
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5097
Telephone: (619) 234-8467
Cindy_Muro@fd.org
Attorneys for Mr. Centeno

### CERTIFICATE OF COMPLIANCE
**9th Cir. Case Number 23-3279; 23-3282**

I am the attorney.

**This brief contains 9,485 words** and excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[  ] it is a joint brief submitted by separately represented parties;

[  ] a party or parties are filing a single brief in response to multiple briefs; or

[  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Cindy V. Muro*        **Date** February 18, 2025

42